668 August 20, 2025 No. 740

IN THE COURT OF APPEALS OF THE
STATE OF OREGON

STATE OF OREGON,
*Plaintiff-Respondent,*

*v.*

MICHAEL C. RAMIREZ,
aka Michael Christopher Ramirez,
*Defendant-Appellant.*

Multnomah County Circuit Court
19CR39534; A179810

Jerry B. Hodson, Judge.

Submitted November 19, 2024.

Ernest G. Lannet, Chief Defender, Criminal Appellate Section, and Neil F. Byl, Deputy Public Defender, Oregon Public Defense Commission, filed the briefs for appellant.

Ellen F. Rosenblum, Attorney General, Benjamin Gutman, Solicitor General, and Peenesh Shah, Assistant Attorney General, filed the brief for respondent.

Before Tookey, Presiding Judge, Kamins, Judge, and DeVore, Senior Judge.

TOOKEY, P. J.

Affirmed.

## TOOKEY, P. J.

Defendant appeals a judgment of conviction for two counts of murder in the second degree with a firearm. The first victim, P, was shot and killed on May 24, 2019, and the second victim, G, was shot and killed a day later. Defendant's first assignment of error concerns the trial court's denial of his motion to exclude "firearms identification" or "toolmark identification" evidence. Applying the Association of Firearm and Toolmark Examiners method (the AFTE method), which involved comparing patterns or marks on cartridge casings and bullets, a forensic examiner determined that the casings and bullets recovered from the two crime scenes were fired from the same gun. In *State v. Adams*, 340 Or App 661, 663, 572 P3d 291 (2025), we recently held that the state failed to show that the AFTE method is scientifically valid and that evidence based on that method is inadmissible.

Applying the analysis set forth in *Adams*, we conclude that the trial court erred in failing to exclude the evidence showing that the cartridge casings and bullets were fired from the same gun. However, considering the role that the evidence played in this case, we conclude that the error in admitting the evidence was harmless. The gun was never recovered and there was no evidence connecting the cartridge casings or the bullets to defendant.[1] The state relied on the toolmark identification evidence to establish that the same firearm was used in both shootings, but that evidence shed no light on who pulled the trigger. Instead, the state relied primarily on eyewitness testimony to prove that defendant shot both victims, and we are not persuaded the jury would have viewed the toolmark identification evidence as bolstering or corroborating the eyewitness accounts in any significant way. As we explain in more detail below, because the error in admitting the toolmark identification evidence was not likely to have affected the jury's verdict, it was harmless. We also reject defendant's second and third assignments of error in which he argues that the trial court erred in denying his demurrer and his motion to sever the charges. We therefore affirm.

---

[1] Because the gun was never recovered, we refer to the evidence in this case as toolmark identification evidence rather than firearm identification evidence.

## I.  FACTUAL AND PROCEDURAL BACKGROUND

Our account of the facts is based primarily on the trial testimony of a number of witnesses. We provide a detailed account of their testimony because it is relevant to our analysis of whether the erroneous admission of the tool-mark identification evidence was harmless.

In the early morning of May 24, 2019, defendant and four others, Rosemary Ordenes, Michael James, Caleb Meyer, and Jonathan Polk were "car prowling," or breaking into cars, in the Lents neighborhood of Portland. Ordenes was James's girlfriend. The group had been using methamphetamine and marijuana.

The victim, P, approached them and warned them not to break into cars. P left but later returned at around 2:00 a.m. When P came back, defendant was inside a car. Meyer, Polk, and James started to leave, but Ordenes waited for defendant. She testified that defendant hopped out of the car and started shooting at P. Ordenes saw a "muzzle flash." She heard four or five shots, she saw defendant and P moving towards the yard of a house, and then she heard more shots. James, who had been walking away, heard eight shots, with a pause of about 10 seconds between two groups of four shots. Home security video footage captured the group leaving the area with defendant being the last to leave.

After fleeing the scene, defendant, James, Ordenes, and Meyer met up nearby. Meyer testified that defendant came running up to them saying he just killed someone. James and Ordenes saw defendant stuff a gun into his fanny pack. Defendant bragged about shooting P, saying that he "dropped him."

Although numerous people in the neighborhood heard the shots, called the police, and came outside, P's body was not discovered immediately. Later that morning, defendant, Ordenes, James, and Meyer drove back to the scene of the shooting. Defendant said, "It's 2019 and we're out here taking souls." Surveillance video footage captured their vehicle driving through the area. Shortly after the group returned to the scene, P's body was discovered in the

front yard of a house by residents who were waking up and getting ready to go to work and school.

The following day, May 25, 2019, Ordenes, James, and defendant met up with G and G's girlfriend, Ashley Panichello-Campbell. G and Panichello-Campbell were in a stolen van, and they drove James, Ordenes and defendant to a hospital parking lot, where they stole a truck. The group later met in the parking lot of an apartment complex.

Around 7:55 p.m., in the parking lot, defendant and G got into an argument and G challenged defendant to a fight. G got out of the van, he walked to the driver's side of the truck, and he started yelling at defendant. Defendant was in the driver's seat of the stolen truck. G told defendant that he would "beat his ass." Defendant said to G, "I'm not going to fight you, I will shoot you." Ordenes was sitting in the middle seat of the truck, and she saw defendant grab his gun from his lap and shoot G in the chest. James and Panichello-Campbell also testified that they saw defendant shoot G. G ran a few paces and fell.

Panichello-Campbell exited the van and ran off. Defendant pulled out of the parking lot quickly, hitting the van in the process. After the shooting of G, defendant sent Facebook messages and made calls trying to locate Panichello-Campbell and stating, "[y]ou know what had to happen." James heard defendant say, "that's how you get away with murder." Ordenes heard defendant say, "this is what I do."

On May 26, 2019, defendant was arrested at Nadaka Park on an unrelated warrant. James and Ordenes were with defendant. Ordenes testified that, when defendant was arrested, he had the gun he used to shoot P and G, but he left it in a car belonging to his "street mom." She was a person who "looked after [defendant] on the streets," she was living out of her car, and she was not defendant's biological mother.

The gun was never recovered. On May 27, 2019, defendant made a telephone call in which he stated that he had nothing on him when he was arrested, that he put "it" in his backpack, and he "left that shit with [his] street mom." On May 28, 2019, on a video call with his biological

mother, defendant made a trigger-pulling motion with his finger and asked, "You did—hey you throw that away?" His mother responded that she was "trying to figure that out."

The state charged defendant with two counts of murder with a firearm and two counts of unlawful use of a weapon with a firearm. Although the police never found the gun, they did recover six cartridge casings and one bullet from the scene of the P homicide. They also recovered one shell casing from the scene of the G homicide and one bullet was recovered from G's body.

Before trial, the court held an OEC 104 hearing on the admissibility of the toolmark identification evidence.[2] Using the AFTE method, Leland Samuelson, a forensic scientist with the Oregon State Police (OSP), compared the toolmarks on the casings recovered, and he determined that five casings from the P homicide and the one casing from the G homicide were fired from the same firearm. Using the same method, he determined that the two bullets recovered from the two separate scenes were fired from the same firearm. After hearing testimony and argument, the trial court ruled that the toolmark identification evidence was admissible and that Samuelson could testify that the toolmarks on the cartridge casings and bullets were "consistent with being fired from the same firearm."

During the trial, Samuelson testified that he worked for the OSP as a "firearms and toolmark examiner." He explained the AFTE method of firearms analysis to the jury. He explained that when a firearm is manufactured, the process leaves marks on the firearm, and that the firearm also leaves marks on bullets and casings when they are fired. Applying the AFTE method, Samuelson looked for "class characteristics" of the bullets and casings—such as their brand, diameter, or weight—to narrow down the type of firearm that could have been used to fire the bullets and casings. He then used a microscope to look for "individual characteristics" and to determine whether there were

---

[2] Under OEC 104, preliminary questions concerning the admissibility of evidence shall be determined by the court. *See State v. O'Key*, 321 Or 285, 307 n 29, 899 P2d 663 (1995) ("When proffered scientific evidence raises issues of scientific validity, those issues should be addressed by the trial court in a separate OEC 104(1) hearing, preferably in advance of trial.").

reproducible or repeatable patterns or marks on the bullets and the casings. He determined that there was "sufficient agreement" regarding the individual characteristics to conclude that they had been fired using the same firearm. Samuelson acknowledged that the AFTE method could not be used to determine who fired the gun.

The jury found defendant guilty of two counts of second-degree murder with a firearm (Counts 1 and 3) and two counts of unlawful use of a weapon (Counts 2 and 4). The trial court merged the guilty verdicts for unlawful use of a weapon with the guilty verdicts for second-degree murder. Defendant was sentenced to consecutive life sentences with a minimum term of 25 years in prison.

## II.  ANALYSIS

On appeal, defendant raises three assignments of error. We address each of those assignments in turn.

A.  *The trial court erred in admitting the toolmark identification evidence, but the error was harmless.*

In his first assignment of error, defendant argues that the trial court erred in admitting the toolmark identification evidence because the state failed to show that the AFTE method is scientifically valid under the factors outlined in *State v. O'Key*, 321 Or 285, 899 P2d 663 (1995), and *State v. Brown*, 297 Or 404, 687 P2d 751 (1984). In *Adams*, 340 Or App at 667-701, we recently analyzed the AFTE method in detail. We determined that "the practitioner's decision on whether the degree of correspondence [between shell casings or bullets] indicates a match ultimately depends entirely on subjective, unarticulated standards and criteria arrived at through the training and individualized experience of the practitioner" and that the "method does not produce consistent results when replicated because it cannot be replicated." *Id*. at 667.

"[W]hen presented as scientific evidence, AFTE identification evidence—an 'identification' purportedly derived from application of forensic science—impairs, rather than helps, the truthfinding process because it presents as scientific a conclusion that, in reality, is a subjective judgment of the examiner based only on the examiner's training and experience and not on any objective standards or criteria."

*Id.* at 668. The same reasoning applies here to Samuelson's application of the AFTE method to determine that the cartridge casings and bullets were fired from the same gun. Indeed, the toolmark identification evidence at issue here was arguably even less reliable that the evidence in *Adams* because, in *Adams*, we explained that the AFTE method involves test firing the firearm to obtain "knowns," which are bullets or cartridge cases that the examiner knows were fired from the firearm in question, and which can be compared with the "unknowns," or, in other words, with the bullets or casings recovered from the crime scene. *Id.* at 670. But here, of course, the gun was never recovered, so that process of comparing knowns and unknowns did not occur. During the trial, there was testimony that it was still possible to compare the casings and the bullets to determine whether they were fired from the same gun.

For the reasons explained in *Adams*, 340 Or App at 688-701, including the AFTE method's reliance on the subjective interpretations of the practitioner, its potential rates of error, and its lack of testability or general acceptance in the broader scientific community, we conclude that the toolmark identification evidence in this case—which was expressly based on the AFTE method—does not meet the test for scientific validity laid out in *Brown* and *O'Key*. As a result, the trial court erred when it admitted the evidence to establish that the casings and bullets found at the scene of the two shootings were fired from the same firearm.

Next, we consider whether the error in admitting that evidence was harmless. We explained the harmless error standard in *State v. Davis*, 336 Or 19, 77 P3d 1111 (2003):

> "Oregon's constitutional test for affirmance despite error consists of a single inquiry: Is there little likelihood that the particular error affected the verdict? The correct focus of the inquiry regarding affirmance despite error is on the possible influence of the error on the verdict rendered, not whether this court, sitting as a factfinder, would regard the evidence of guilt as substantial and compelling."

*Id.* at 32. In determining whether the error affected the verdict, we must be careful not to reweigh the evidence or retry the case to determine whether defendant is guilty. *Id.*

> "Rather, when we review the record, we do so in light of the error at issue. We ask whether there was little likelihood that the error affected the jury's verdict. We recognize that, if the particular issue to which the error pertains has no relationship to the jury's determination of its verdict, then there is little likelihood that the error affected the verdict. However, that is not a finding about how the court views the weight of the evidence of the defendant's guilt. It is a legal conclusion about the likely effect of the error on the verdict."

*Id*.

Applying that standard here, we conclude that the erroneous admission of the toolmark identification evidence was harmless. We recognize that the evidence had some probative value in helping to establish that it was more likely that the person who shot one of the victims was also the person who shot the other victim. But it played no significant role in establishing who that person was. We also acknowledge that the jury would have perceived the evidence as scientific and that such evidence "possesses an unusually high degree of persuasive power." *Jennings v. Baxter Healthcare Corp.*, 331 Or 285, 303, 14 P3d 596 (2000) (internal quotation marks omitted). Nevertheless, it would have been persuasive regarding the question of whether the same gun was used, not who fired the gun. Indeed, as defendant argued in closing,

> "that ballistics evidence doesn't tell you a thing about the person who pulled the trigger of the gun on May 24th or May 25th. It tells you nothing about who did that.
>
> "* * * * *
>
> "And despite that determination by Mr. Samuelson that the same gun fired these six shots, and despite his confidence in the art of ballistics matching, he couldn't tell you who pulled the trigger."

We agree with that argument. Our review of the record indicates that the toolmark identification evidence did not play a significant role in this case. It was mainly used by the state to create a link or connection between the two shootings, but it was not probative of who fired the gun on each occasion.

In arguing that the erroneous admission of the evidence was not harmless, defendant claims that the state "relied heavily" on the toolmark identification evidence "to corroborate the eyewitness testimony, bolster the eyewitness' credibility, and demonstrate that its case was based on more than just the word of four teenagers who had been high on drugs and may have had their own reasons to point the finger at defendant[.]"

We have reviewed the record and conclude that the erroneous admission of the toolmark identification evidence was not likely to have affected the jury's verdict. First, addressing the shooting of P, there was testimony from multiple witnesses supporting the state's theory that defendant was the shooter and the toolmark identification evidence had no clear relationship to that testimony. Ordenes was the only person who actually saw defendant fire shots at P. She testified that defendant "hopped out of the car and starting shooting at him." She heard gun shots and saw a "muzzle flash." After the shooting, she saw defendant stuffing a gun in his fanny pack.

The group that was "car prowling" in the early hours of May 24 included Meyer, who testified that he heard gun shots and then defendant "came running around the corner saying he just killed" someone. James also testified about hearing the gun shots and that defendant was "bragging about it," saying that "he dropped him," which James understood to mean that defendant had killed P. James saw defendant tuck a gun into his fanny pack.

Addressing the later shooting of G, multiple eyewitnesses testified that defendant shot G. G's girlfriend, Panichello-Campbell, testified that G said, "he was gonna beat [defendant's] ass," that defendant responded, "I'm not gonna fight you, I will shoot you," and then she heard and saw defendant shoot G once in the chest and speed away in the white truck. James testified that he heard the gun shot and he saw "a bullet go through [G's] chest." And Ordenes saw defendant grab the gun from his lap and shoot G in the chest.

In *Davis*, 336 Or at 32, the court explained that "if the particular issue to which the error pertains has no

relationship to the jury's determination of its verdict, then there is little likelihood that the error affected the verdict." Here, we do not think that the erroneous admission of the toolmark identification evidence—which was used to show that the same gun was used in the two shootings—bore any significant relationship to those eyewitness accounts of defendant shooting both P and G. Regarding the shooting of G, evidence showing that the same gun was used in another shooting a day earlier would not have made the jury more likely to believe the three eyewitnesses, who expressed no uncertainty about whether defendant was the shooter. And although only Ordenes saw defendant shoot P, Meyer's and James's testimony corroborated her account of what occurred. Her testimony was also corroborated by surveillance video footage showing the group in the neighborhood and returning to the area later the same morning. Because the question of whether the same gun was used in both shootings is sufficiently distinct from the question of who fired the gun, we conclude that the erroneous admission of the toolmark identification evidence in this case was harmless. *See Davis*, 336 Or at 32 (explaining that the correct focus of the harmless-error inquiry is on "the possible influence of the error on the verdict rendered").

In arguing otherwise, defendant focuses on Ordenes's testimony, and he argues that the toolmark evidence "purporting to show that the same firearm was used in both murders was powerful physical evidence bolstering Ordenes's testimony that defendant committed both murders with the same firearm that she saw defendant put in the car belonging to his 'street mom.'" We do not think that argument has merit.

First of all, the toolmark identification evidence did not bolster Panichello-Campbell's or James's eyewitness accounts of defendant shooting G in the chest. It also bore no clear relationship to Meyer's or James's accounts of what occurred a day earlier or to James's testimony that he saw defendant stuff a gun in a fanny pack. We recognize that the toolmark identification evidence may have provided some minimal corroboration for Ordenes's testimony because she was the only eyewitness who saw defendant shoot both

victims. But whatever value it may have had in corroborating her testimony did not rise to the level of creating a likelihood that it affected the verdict. Her eyewitness testimony was direct evidence—not circumstantial evidence—that defendant was the shooter, and her account of what occurred was consistent with the testimony of numerous other witnesses.

At trial, in seeking to undermine the eyewitness testimony, defendant argued or suggested that Panichello-Campbell's testimony that defendant shot her boyfriend was not credible because she was "kidnapped" after the shooting of G by a close friend of the victim, and her phone was taken from her and handed over to the police. Defendant sought to use those facts to suggest that the police did not sufficiently investigate all possible leads. Whether or not that argument had any value in undermining the credibility of Panichello-Campbell's eyewitness account of defendant shooting G, it certainly had no relationship to whether the same gun was used in another shooting a day earlier.

Similarly, at trial, in seeking to attack Ordenes's credibility, defendant argued that she stole a gun about 10 days before the shootings, and defendant questioned Ordenes's claim that it had been sold before the shootings. Once again, that attempt to undermine Ordenes's credibility had no clear relationship to the toolmark identification evidence, which was merely used to establish that the gun used in both shootings was identical.

Defendant argues that the erroneous admission of the evidence must have affected the jury's verdict because the state relied on that evidence during closing arguments. Having reviewed the closing arguments, we observe that the state relied on surveillance video footage to bolster the eyewitness testimony of who shot the two victims, but it did not rely on the toolmark identification evidence to do so. Instead, it relied on the toolmark identification evidence to argue that the casings and bullets were fired from the same gun and to establish a link or connection between the two shootings. In rebuttal, in response to defendant's argument that the state had no physical evidence, the prosecutor pointed once again to the toolmark identification evidence.

However, in doing so, the prosecutor emphasized that that evidence established that the same gun was used in both shootings, not that defendant was the shooter.

In concluding that the error in failing to exclude the toolmark identification evidence was harmless, we emphasize that we have taken care not to reweigh the evidence or retry the case. *See, e.g.*, *State v. Zaldana-Mendoza*, 299 Or App 590, 613, 450 P3d 983 (2019) (explaining that when conducting a harmless-error analysis, "we do not usurp the role of the factfinder and determine if defendant is guilty or reweigh the evidence"). Instead, we have focused on the possible influence of the erroneous admission of the toolmark identification evidence on the jury's assessment of the other evidence. Here, the toolmark identification evidence addressed a peripheral issue; namely, whether the same gun was used in both shootings. But the eyewitness accounts of Panichello-Campbell, James, Meyer, and Ordenes concerned the central factual issue—whether defendant pulled the trigger. The erroneous admission of evidence tending to show that the same gun was used in both shootings was not likely to have significantly affected the jury's assessment of their testimony, each of whom provided evidence supporting the state's case that defendant was the shooter. *See, e.g.*, *State v. Hickman*, 355 Or 715, 749, 330 P3d 551 (2014), *adh'd to as modified on recons*, 356 Or 687, 343 P3d 634, *cert den*, 577 US 896 (2015) (concluding that any error in admitting a witness's in-court identification of the defendant was harmless because other witnesses identified the defendant as the perpetrator and there was DNA evidence connecting the defendant to the shooting).

B.  *The trial court did not err in denying defendant's demurrer or his motion to sever the two sets of charges.*

We turn to defendant's second and third assignments of error. Defendant filed a pretrial demurrer and motion to sever Counts 1 and 2 (relating to the P homicide) from Counts 3 and 4 (relating to the G homicide). Defendant argues that the trial court erred in denying those motions because the offenses were not of the same or similar character and joinder of the charges caused him substantial prejudice. The state responds that the trial court correctly ruled

that the two murders could at least possibly be of the same or similar character and that defendant's assertions of prejudice were insufficient to require severance. We agree with the state.

We begin with defendant's challenge to the trial court's denial of his demurrer in which he argued that the two sets of offenses were improperly joined in the indictment. "We review a trial court's determination that the state met the statutory requirements for joinder of charges for legal error." *State v. Brown*, 326 Or App 46, 50, 531 P3d 178, *rev den*, 371 Or 332 (2023) (internal quotation marks omitted). "[T]here are two requirements for the state to charge multiple offenses in the same indictment: the state's basis for joining the offenses must be 'possible, given the offenses and facts alleged,' and the state's basis for joining the offenses must be alleged." *State v. Taylor*, 364 Or 364, 373, 434 P3d 331 (2019) (quoting *State v. Warren*, 364 Or 105, 122, 430 P3d 1036 (2018)).

Here, the indictment expressly alleged a statutory basis for joinder; namely, that the conduct alleged in Counts 1 and 2 was of "the same and similar character" as the conduct alleged in Counts 3 and 4. And the state's basis for joining the offenses was "possible" because the indictment alleged that the two sets of crimes occurred only a day apart, that they were committed by the same defendant, and the indictment also alleged that the two murders were committed using a firearm. In arguing against the trial court's denial of his demurrer, defendant relies primarily on *State v. Garrett*, 300 Or App 671, 455 P3d 979 (2019), *rev den*, 366 Or 827 (2020), but defendant's reliance on that case is misplaced because, in *Garrett*, the indictment did not allege that the charges were of the same or similar character. *Id.* at 679. We conclude the trial court did not err in ruling that the two sets of charges could be joined pursuant to ORS 132.560.

In his third assignment of error, defendant argues that he suffered substantial prejudice as a result of the denial of his motion to sever Counts 1 and 2 from Counts 3 and 4. A defendant "seeking severance under ORS 132.560(3) must identify a case-specific theory of substantial prejudice that

is more than the prejudice that is inherent whenever joined charges allow the jury to hear that the defendant may have committed other bad acts." *State v. Delaney*, 370 Or 554, 556, 522 P3d 855 (2022). We review the trial court's conclusion with respect to whether a defendant has established substantial prejudice for errors of law. *Id*.

Here, the trial court determined that defendant failed to establish substantial prejudice under ORS 132.560. The trial court explained:

> "In this case the evidence will be mutually admissible. The evidence is sufficiently simple and distinct that the jury will be able to consider the offenses separately. And the joinder rule's underlying purpose of judicial economy is significantly served by trying these charges together."

The trial court did not err in its determinations. On appeal, defendant argues that the defenses of self-defense and mistaken identity were "available" to defendant regarding the P shooting, but not regarding the G shooting. But defendant fails to explain how or why a joint trial impaired his ability to present different defenses to each set of crimes. We reject defendant's contention that trying the cases together allowed the jury to "impermissibly infer defendant's bad character" or led to "impermissibly cumulative evidence," because those arguments do not articulate a case-specific theory of prejudice that goes beyond the prejudice inherent in any case in which the charges are joined. *Delaney*, 370 Or at 556. Defendant also fails to explain why trying the charges together infringed on his right to testify.

Affirmed.